729 S.E.2d 188

**CITY OF NEW MARTINSVILLE,**
Petitioner

v.

**The PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; and Monongahela Power Company and The Potomac Edison Company, Both Doing Business as Allegheny Power, Respondents**

and

**Morgantown Energy Associates,**
Petitioner

v.

**The Public Service Commission of West Virginia; and Monongahela Power Company and the Potomac Edison Company, Both Doing Business as Allegheny Power, Respondents.**

Nos. 11–1738, 11–1739.

Supreme Court of Appeals of West Virginia.

Submitted April 10, 2012.

Decided June 11, 2012.

Robert R. Rodecker, Esq., Charleston, WV, Attorney for the City of New Martinsville.

E. Dandridge McDonald, Esq., Ancil G. Ramey, Esq., Steptoe & Johnson PLLC, Charleston, WV, Attorneys for Morgantown Energy Associates.

Richard E. Hitt, Esq., Charleston, WV, Attorney for the Public Service Commission.

Christopher L. Callas, Esq., Stephen N. Chambers, Esq., Elizabeth A. Amandus, Esq., Jackson Kelly PLLC, Charleston, WV, Attorneys for Monongahela Power Company and The Potomac Edison Company.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Public Service Commission of West Virginia (hereinafter "Commission")[1] entered on November 22, 2011, ruling upon a Joint Petition for Declaratory Order filed by the respondents herein, Monongahela Power Company and the Potomac Edison Company, both doing business as Allegheny Power (hereinafter referred to separately as "Mon Power" and "PE" or collectively as "the Utilities"). In its final order, the Commission held that the alternative and renewable energy resource credits attributable to energy purchases by the Utilities from the petitioners herein, the City of New Martinsville and Morgantown Energy Associates (hereinafter referred to separately as "the City" and "MEA" or collectively as "the Generators") are owned by the Utilities during the terms of the Electric Energy Purchase Agreements between the entities.

In this appeal, the Generators contend that the Commission erred in its ruling and that the energy resource credits are owned by them.[2] MEA also argues that the Commis-

1. Pursuant to W. Va.Code § 24–5–1 (1979) (Repl. Vol.2008), "Any party feeling aggrieved by the entry of a final order by the [C]ommission, affecting him or it, may present a petition in writing to the Supreme Court of Appeals, or to a judge thereof in vacation, within thirty days after the entry of such order, praying for the suspension of such final order."

2. The Generators filed separate petitions for appeal, and this Court assigned separate case numbers thereto. Because the Generators are appealing the same order, the appeals have been considered together for purposes of oral argument and decision.

sion erred by holding that it would deem MEA's Morgantown project as a certified facility under the Alternative and Renewable Energy Portfolio Act, W. Va.Code §§ 24–2F–1 to –12, for the purpose of generating energy resource credits upon the submission of sufficient evidence by the Utilities.

This Court has before it the petitions for appeal, the responses thereto including the Statement of Reasons filed by the Commission, and the appendices filed by the parties. For the reasons set forth below, the final order of the Commission is affirmed.

## I. FACTS

In response to the energy crisis of the 1970s, Congress amended the Federal Power Act, 16 U.S.C. § 791 *et seq.*, and enacted the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 (1978) (hereinafter "PURPA"). The purpose of PURPA was to reduce the nation's electric utilities' dependence on foreign fossil fuels by promoting the development and use of alterative sources of energy. *Id.* To that end, PURPA created a new class of electric generating facilities known as qualifying facilities or "QFs" that include congeneration facilities and small power producers. A cogeneration facility produces both electricity and some other form of useful energy such as steam or heat, whereas a small power production facility produces electric energy using biomass, waste or renewable resources. 16 U.S.C. § 796(18)(A) & (17)(A).

Pursuant to PURPA, an electric utility whose service territory includes a QF is required to purchase power from the QF at the utility's avoided cost—the incremental energy and capacity costs that the utility would have incurred from generating the electricity or purchasing the electricity from another source but for the purchase of the electricity from the QF. 18 C.F.R. § 292.101(b)(6). The contracts between electric utilities and QFs setting forth, *inter alia*, the avoided cost, are known as Electric Energy Purchase Agreements (hereinafter "EEPAs").

In 2009, the West Virginia Legislature enacted the Alternative and Renewable Energy Portfolio Act (hereinafter "Portfolio Act"), W. Va.Code §§ 24–2F–1 to –12. The Portfolio Act requires that electric utilities acquire or generate a certain percentage of their electric supply from specified energy sources. In order to establish, verify and monitor the generation of electricity from alternative and renewable energy resource facilities, the Portfolio Act created a system of tradable instruments known as alternative and renewable energy resource credits (hereinafter "credits"). W. Va.Code 24–2F–3(4) (Repl. Vol.2008 & Supp.2011). Depending upon the type of facility, one, two or three credits are created by each megawatt hour of electricity generated. 150 C.S.R. § 34A. Pursuant to W. Va.Code § 24–2F–5(d) (Repl.Vol.2008 & Supp.2011):

> (1) For the period beginning January 1, 2015, and ending December 31, 2019, an electric utility shall each year own credits in an amount equal to at least ten percent of the electric energy sold by the electric utility to retail customers in this state in the preceding calendar year; and

> (2) For the period beginning January 1, 2020, and ending December 31, 2024, an electric utility shall each year own credits in an amount equal to at least fifteen percent of the electric energy sold by the electric utility to retail customers in this state in the preceding calendar year.

Subsequently, "[o]n and after January 1, 2025, an electric utility shall each year own credits in an amount equal to at least twenty-five percent of the electric energy sold by the electric utility to retail customers in this state in the preceding calendar year." W. Va.Code § 24–2F–5(c).

The parties in this case executed EEPAs in the 1980s, long before the creation of credits in West Virginia and before the widespread creation of credits in other jurisdictions. Thus, the EEPAs are silent on the issue of ownership of and entitlement to credits generated from QFs. The three QFs involved in this case are: (1) the Hannibal project, a run-of-river hydropower facility located on the Ohio River in New Martinsville, West Virginia, and owned by the City; (2) the Grant Town project, a generation facility using coal and waste coal located in Grant Town, West Virginia, and owned by Ameri-

can Bituminous Power Partners, L.P. (hereinafter "AmBit");[3] and (3) the Morgantown project, a cogeneration facility using coal and waste coal located in Morgantown, West Virginia, and owned by MEA. Hannibal and Grant Town have been certified as qualified energy resources to generate credits under the Commission's Rules Governing Alternative and Renewable Energy Portfolio Standard (hereinafter referred to as "Portfolio Standard Rules"), 150 C.S.R. § 34 (2011).[4] While MEA's Morgantown project may qualify for certification as a qualified energy resource under the Portfolio Standard Rules, it has not sought such certification and indicates that it does not intend to do so.[5] The Morgantown project is certified to generate credits under Pennsylvania law. The terms and conditions of the EEPAs between the Utilities and the QFs vary.[6] Each EEPA contains a different purchase price based on the parties' negotiations and determination of avoided costs at the time of the contract negotiations or Commission adjudication.[7]

On February 23, 2011, the Utilities sought a declaratory order from the Commission requesting that the Commission hold that the Utilities own the credits from the QFs as well as any other environmental attributes from the QFs during the terms of the EEPAs.[8] On March 4, 2011, the City filed a Petition to Intervene and Response in Opposition to the Utilities' petition for a declaratory order. On April 19, 2011, the Commission granted the City's motion to intervene and also named MEA as a respondent in the case. The Commission also entered an order prohibiting MEA and the City from selling or transferring or committing to sell or transfer any credits generated from their QFs pending the Commission's ruling.[9] On April 22, 2011, the Utilities requested leave to amend their Joint Petition, asking that the Commission compel MEA to seek certification of the Morgantown project so that it is qualified to generate credits under the Portfolio Act. Alternatively, the Utilities asked that the Commission use its inherent authority under the Portfolio Act to certify the Morgantown project as qualified to generate credits if the Commission concluded that the credits were owned by the Utilities and the QF declined to obtain certification. Evidentiary hearings were then scheduled and held

3. The Commission invited AmBit to participate as a party in this proceeding by order entered on May 1, 2011. AmBit elected to not participate and is not a party herein. According to the Utilities, Ambit has ceded its right to the PURPA credits associated with the generation from the Grant Town project; however, the parties' "Letter of Understanding" on this issue provides that if the Commission determines that QFs are entitled to own the PURPA credits, the "Letter of Understanding" will be terminated. Consequently, the Utilities acknowledge that this Court's decision also affects the PURPA credits generated by the Grant Town project.

4. The Legislature directed the Commission to promulgate rules to effectuate the purposes of the Portfolio Act. See W. Va.Code § 24–2F–12 (Repl.Vol.2008 & Supp.2011).

5. By Commission order dated July 20, 2011, the Hannibal project was certified as a qualified energy resource to generate credits pursuant to the Portfolio Standard Rules. As a renewable energy resource facility, the Hannibal project creates two credits for every megawatt hour of electricity generated. See 150 C.S.R. § 34A. According to the Utilities, the Morgantown project would be entitled to one credit for each megawatt of electricity generated if it were certified.

6. The EEPAs were executed by the QFs and Mon Power, but the Commission now regulates the combined West Virginia operations of Mon Power and PE as a single entity, including the combined costs and rates.

7. The purchase prices for the Hannibal and Morgantown projects were arrived out of negotiations between the parties; the Grant Town purchase price was established by the Commission.

8. The EEPA for the Hannibal project was approved in 1986 and extends until 2034. The EEPA for the Grant Town project was approved in 1988 and extends to 2036. The EEPA for the Morgantown project was approved in 1989 and extends until 2027.

9. Various regional entities serve as "banks" that keep track of the credits. The entity that services West Virginia and Pennsylvania, as well as some other states, is PJM–Environmental Information Services, Inc. (hereinafter "PJM"). The system that PJM uses to account for the credits is the Generation Attribute Tracking System. Once a credit created by the generation of a particular megawatt-hour of electricity is redeemed in a state, it cannot be used to meet another's state's alternative energy, advanced energy, renewable energy or similar energy portfolio standard. W. Va.Code § 24–2F–5(e). In other words, double-counting of credits is prohibited.

on August 25, and 26, 2011. On November 22, 2011, the Commission entered its order ruling in favor of the Utilities.

In its November 22, 2011, order, the Commission concluded that the Utilities own the credits associated with the generation of electricity from the QFs because of three separate but interrelated bases. The Commission's order states:

> (i) consistent with the Act, the utility that is obligated to purchase PURPA generation (which also qualifies as eligible generation under the Portfolio Act) should own the credits that exist for the purpose of measuring utility compliance with the portfolio standard, (ii) Mon Power and PE's ownership of the credits is based on their ownership of the qualifying energy as it is generated, and (iii) under the circumstances of the case in which the Portfolio Act and the EEPAs do not contain provisions that specify credit ownership by the utility or the QF, it is appropriate to consider equity and fairness and the impact of our decision on utility rates in determining credit ownership under the EEPAs based on the provisions of *W.Va.Code* 24–2F–1 *et seq.* that require that the costs associated with the Act are reasonable and the provisions of Chapter 24 of the *West Virginia Code* that require the Commission to ensure fair and reasonable rates and to balance the interests of the current and future utility customers, the utilities, and the state economy.

With respect to the Utilities' request that the Morgantown project be certified under the Portfolio Act to generate credits, the order states that the Commission

> will consider the relief requested in the [Utilities'] amended Joint Petition and determine whether the Morgantown project may be certified as a qualified energy resource to generate credits provided that adequate information is provided to support certification of the facilities under the Commission *Portfolio Standard Rules.* We determine that allowing qualifying credits that are owned by the [Utilities] to not be certified would work a hardship on ratepayers and that due to the unusual difficulty involved if the [Utilities] would

seek or expect cooperation from the MEA in obtaining certification of the [Morgantown project] it is reasonable to allow the [Utilities] to seek certification of the credits they own as a result of the Morgantown EEPA.

On December 15, 2011, MEA filed a Motion to Stay the November 22, 2011, order with the Commission. The following day, the City filed its response supporting MEA's motion to stay. By order entered on December 20, 2011, the Commission granted the Motion to Stay. MEA and the City filed their separate petitions for appeal with this Court on December 22, 2011.

## II. STANDARD OF REVIEW

In Syllabus Point 1 of *Central West Virginia Refuse, Inc. v. Public Service Commission of West Virginia,* 190 W.Va. 416, 438 S.E.2d 596 (1993), this Court explained:

> The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission,* 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.

This Court has also stated that

> " 'an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. The Public Service Commission,* 143 W.Va. 33, [99 S.E.2d 1 (1957) ]." Syllabus Point 5, in part, *Boggs v. Public Service Comm'n,* 154 W.Va. 146, 174 S.E.2d 331 (1970).

Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission of West Virginia,* 180 W.Va. 387, 376 S.E.2d 593 (1988). With these standards in mind, the issues presented in these appeals will be considered.

## III. DISCUSSION

As noted, the City and MEA filed separate petitions for appeal with this Court. Both of them, however, challenge the Commission's decision declaring that the credits at issue are owned by the Utilities. While some of the arguments presented on this issue overlap to a significant extent, each party has also made distinct arguments specific to its particular circumstances. In the analysis that follows, the party or parties making each argument will be identified. Also, as previously noted, the second assignment of error only relates to MEA and concerns whether the Commission has jurisdiction and authority to deem MEA's Morgantown project certified under the Portfolio Standard Rules. Each assignment of error will be considered in turn below.

### A. Ownership of the Credits

Traditionally, state utility commissions had no authority with regard to wholesale power contracts. Rather, exclusive jurisdiction over such contracts belonged to the Federal Energy Regulatory Commission (hereinafter "FERC") under the Federal Power Act, 16 U.S.C. 791 *et seq.* With the enactment of PURPA, however, state utility commissions have been authorized to initially set the avoided cost rates for qualifying PURPA projects. Once the state commission approves the EEPA though, it is generally without jurisdiction to modify the terms of the agreement. 16 U.S.C. § 824a–3. Pursuant to regulations promulgated by FERC, any QF is "exempted ... from State law or regulations respecting: (i) the rates of electric utilities; and (ii) the financial and organizational regulation of electric utilities." 18 C.F.R. § 292.602(c).

With the enactment of portfolio standard laws in several states, which generally require electric utilities to acquire or generate a certain percentage of their electric supply from specified energy resources, and the creation of credits as a means of monitoring compliance therewith, the question of credit ownership under PURPA contracts arose. In 2003, FERC issued a decision in *Ameri-*

can *Ref–Fuel Co., Covanta Energy Group, Montenay Power Corp. and Wheelabrator Tech., Inc.,* 105 FERC ¶ 61004 (October 1, 2003), declaring that the issue of credit ownership under PURPA contracts is a matter to be decided by the states based on state law.

In *American Ref–Fuel,* FERC granted a petition for declaratory judgment filed by the owners of several QFs across the United States "to the extent that they ask [FERC] to declare that contracts for the sale of QF capacity and energy entered into pursuant to PURPA do not convey [credits] to the purchasing utility (absent express provision in a contract to the contrary)." 105 FERC at 61005. In so holding, FERC explained:

> What is relevant here is that the [credits] are created by the States. They exist outside the confines of PURPA. PURPA thus does not address the ownership of [credits]. And the contracts for sales of QF capacity and energy, entered into pursuant to PURPA, likewise do not control the ownership of the [credits] (absent an express provision in the contract). States, in creating [credits] have the power to determine who owns the [credits] in the initial instance, and how they may be sold or traded; it is not an issue controlled by PURPA.

105 FERC at 61007. Thus, FERC concluded that "[w]hile a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created [credits], that requirement must find its authority in state law, not PURPA." *Id.*

In this case, the City and MEA argue that our state law resolves the issue of credit ownership in favor of the QFs and that the Commission's decision to the contrary must be reversed.

**1. Applicability of the Commission's Portfolio Standard Rules.** First, both the City and MEA contend that the Commission erred by not applying the Portfolio Standard Rules which it promulgated and which provide that the credits are owned by the Generators. The City primarily argues that Rule 5.6 of the Portfolio Standard Rules [10] specify-

---

**10.** 150 C.S.R. § 34–5.6 states as follows:

An electric utility may meet the alternative and renewable energy Portfolio Standard re-

ing that credits can be sold bundled or unbundled with the energy necessarily means that the generator owns the credits associated with the energy it produces. MEA maintains that Portfolio Standard Rule 5.2 [11] which permits non-utility generators to be certified to generate credits constitutes an affirmative, knowing determination on the part of the Commission that non-utility generators are to be awarded credits automatically and in every instance. In support of their arguments, the Generators note that this Court has stated that "[a]n administrative agency is, of course, obligated to 'follow and apply its rules and regulations in existence at the time of agency action.'" *In re Tax Assessment Against American Bituminous Power Partners, L.P.*, 208 W.Va. 250, 256, 539 S.E.2d 757, 763 (2000) (quoting *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 583 n. 8, 466 S.E.2d 424, 434 n. 8 (1995)).

Conversely, the Utilities assert that ownership of credits associated with the EEPAs was not contemplated during the rulemaking process and that the Commission correctly concluded that the Portfolio Standard Rules do not apply to PURPA contracts that existed prior to the enactment of the Portfolio Act and promulgation of the Portfolio Standard Rules. In its order, the Commission acknowledges that "MEA and [the] City are correct that a non-utility generator may be entitled to the credits for qualified generation from its generating facility based on the Commission *Portfolio Standard Rules* issued by the Commission in General Order No. 184.25." [12] The Commission explained, however, that the rulemaking proceeding "did

not address PURPA EEPAs executed prior to the Act, and the unbundling provision of the Rules was not intended to apply to these pre-existing agreements." The Commission concluded that "[t]he Rules cannot reasonably be applied retroactively to these PURPA EEPAs and were intended to apply prospectively to agreements for the purchase of electricity entered into after January 4, 2011, the effective date of the Rules."

■ Upon review, it is clear that the Commission did not err by refusing to apply the Portfolio Standard Rules to the PURPA EEPAs at issue in this case. This Court has long held that, "[a] statute is presumed to operate prospectively unless the intent that it shall operate retroactively is clearly expressed by its terms or is necessarily implied from the language of the statute." Syllabus Point 3, *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980). Moreover, this Court has further explained that "[b]ecause legislative rules have the force and effect of statutes, the presumption of prospective application applies equally to such rules." *Summers v. West Virginia Consolidated Public Retirement Bd.*, 217 W.Va. 399, 405, 618 S.E.2d 408, 414 (2005); *see also Far Away Farm, LLC v. Jefferson County Bd. of Zoning Appeals*, 222 W.Va. 252, 664 S.E.2d 137 (2008) (finding that amendments to a zoning ordinance could not be applied retroactively to a permit application). Here, there is no indication, either expressly or impliedly, that the Portfolio Standard Rules were meant to be applied retroactively. Accordingly, there is no merit to the Generators' argument that Portfolio Standard Rules are applicable.

---

quirements set forth in this rule by purchasing additional credits awarded pursuant to Rule 5.2. An electric utility purchasing power may meet the Portfolio Standard requirements set forth in this rule, provided that the credit awarded pursuant to Rule 5.2 is included in, or bundled with, the purchase of the power. Credits may also be purchased independently, or unbundled from, purchased power.

**11.** *150 C.S.R. § 34–5.2 provides: "A qualified energy resource certified under Rule 4.2.a or 4.2.c shall be awarded certified alternative and renewable energy resource credits as summarized in Table 150–34A at the end of this rule and as described below[.]"*

**12.** The Portfolio Act required the Commission to consider extending, by rule, the awarding of credits to "electric distribution companies or electric generation suppliers other than electric utilities" or to non-utility generators. W. Va. Code § 24–2F–10(b). Thus, by its November 10, 2010, order issuing the Portfolio Standard Rules, the Commission extended the award of credits representing the generation of electricity from alternative and renewable energy resources to non-utility generators, but limited the award of credits for greenhouse gas emissions or reduction or offset projects and energy efficient and demand-side energy initiative projects to the state electric utilities.

**2. Alleged Contractual Modification.** Both the City and MEA argue that the Commission's decision to award the credits to the Utilities modifies the EEPAs between the entities contrary to both PURPA and West Virginia contract law.

**a. Preemption.** The Generators contend that the Commission's decision modifies the avoided cost rate in the EEPAs which is expressly prohibited by PURPA. In other words, MEA and the City argue that the avoided cost rate in the EEPAs now pays for energy, capacity and the credits. Therefore, they conclude that the avoided cost rate received by the QFs is lowered by the value of the credits such that the QFs' compensation for energy and capacity is less than the full avoided cost rate it received before. The Generators maintain that this modification of the EEPA's price terms constitutes a "utility-type regulation" in violation of PURPA, 16 U.S.C. § 824a–3(e). In support of their argument, the parties rely upon *Freehold Cogeneration Associates, L.P. v. Board of Regulatory Commissioners of the State of New Jersey*, 44 F.3d 1178 (3rd Cir.1995).

In *Freehold,* a state regulatory agency ordered a QF to renegotiate the terms of its energy purchase agreement with the utility in response to decreases in the cost of obtaining electrical power. The QF then filed a declaratory judgment action seeking a declaration that the state agency was preempted by PURPA from modifying the terms of the previously approved power purchase agreement. In granting relief to the QF, the United States Court of Appeals for the Third Circuit observed that under PURPA, it is FERC and not state agencies that is responsible for regulating the rates charged by QFs in power purchase agreements. 44 F.3d at 1191. The Third Circuit recognized that state regulatory agencies have the authority to implement PURPA by initially reviewing and approving contracts for the sale of electricity. *Id.* Once the state agency has approved the agreement, however, any attempt to modify the agreement would subject the QF to "utility-type" regulation barred by Section 210(e) of PURPA. *Id.* at 1192.

■ Upon review, we find that *Freehold* has no application in this instance. Contrary to the assertions of the Generators, the Commission has not modified the terms of the existing EEPAs but, instead, has only determined ownership of assets—the credits—which were not contemplated and, thus, not provided for in the EEPAs. Other jurisdictions that have considered this same issue agree that an interpretation of a power purchase agreement which is silent on the issue of credit ownership does not violate PURPA. *See Wheelabrator Lisbon, Inc. v. Connecticut Dept. of Public Utility Control,* 531 F.3d 183 (2nd Cir.2008) (finding that Department of Public Utility Control did not order the renegotiation of the terms of the electric energy purchase agreement in violation of PURPA but simply exercised its authority to interpret the agreement's provisions when it concluded that electric utility was entitled to the renewable energy credits); *ARIPPA v. Pennsylvania Public Utility Comm'n,* 966 A.2d 1204, 1211 (Pa.Cmwlth.2009) (concluding that "PURPA did not preempt the Commission's authority to determine the ownership of alternative energy credits at issue"). Here, the Commission considered the EEPAs and concluded that because the Utilities own the electricity as it is generated, they also own the credits which only come into existence after the electricity is generated. The Commission explained in its order that

> the purchase of generation under the PURPA EEPAs results in the utility owning the generation and the credits associated with the generation. The [Utilities] own the electricity because under PURPA and the EEPAs, Mon Power is required to purchase all of the qualifying electricity generated from the PURPA facilities as that electricity is generated. Because the credits are created by state law and exist only as the electricity is generated, it follows that Mon Power as the purchaser and owner of the qualifying generation at the time the electricity is generated owns the credits under the EEPAs.

Thus, in reaching its decision, the Commission has only interpreted the EEPAs to evaluate the Utilities' obligations under them and their ownership of the electricity at the time it is generated. The Commission has not interfered with the Generators' federally-

granted right to be exempt from certain utility-type state regulation. Accordingly, we find no merit to the Generators' argument.

**b. Application of West Virginia contract law.** MEA argues the Commission's conveyance of the credits under the EEPAs to the Utilities contravenes West Virginia contract law. In that regard, MEA says that nothing in West Virginia contract law permits the Commission to read a conveyance of credits into the EEPA when the EEPA contains no such conveyance and makes no mention of credits because they did not exist at the time the EEPA was executed. MEA notes that this Court long ago stated that "the intention of the parties is controlling, and must be ascertained from the language of the instrument." *Berry v. Humphreys,* 76 W.Va. 668, 670, 86 S.E. 568, 568 (1915). MEA further argues that the Commission's conclusion that the Utilities own the credits because they purchase the electricity and the credits only come into existence after the electricity is generated is not logical considering the fact that steam is also generated along with the electricity yet it is not conveyed under the EEPA.

 With regard to MEA's argument which attempts to equate the steam by-product of its generation with the credits, the record shows that steam was recognized at the time the EEPA was created as a tangible by-product of the generation with a separate commercial value. In fact, the steam is separately captured and sold to West Virginia University. By contrast, the credits are an intangible creation of state law that only exist because of the electric generation from a statutorily-recognized plant. Because the Commission concluded that the Utilities own the credits in the first instance since they own the electricity as it is generated, there is simply no merit to MEA's claim that the credits were conveyed to the Utilities without consideration. In other words, it is irrelevant that the EEPA provides no consideration for the credits because the credits are

created after the generation of electricity and are, therefore, owned by the Utilities.[13]

**c. Applicability of *Energy Dev. Corp. v. Moss,* 214 W.Va. 577, 591 S.E.2d 135 (2003).** The City also contends that the Commission erred by refusing to find that its EEPA contains a latent ambiguity based upon this Court's holding in *Energy Development Corporation v. Moss,* 214 W.Va. 577, 591 S.E.2d 135 (2003). In that case, this Court considered whether a standard oil and gas lease executed in 1986 conveyed to the lessee the right to drill into the lessor's coal seams in order to produce coalbed methane, absent any specific language in the lease addressing the issue. When the lease was signed, coalbed methane was a relatively new source of energy that had not been commercially available in West Virginia. This Court determined that the lease, absent a clear conveyance of the coalbed methane, contained a latent ambiguity. Therefore, the lease was deemed ambiguous. Based on the intent of the parties, including the fact that the lessee may have been aware of the value of the coalbed methane when the lease was executed, but the lessor was not, and that no coalbed methane wells had been drilled in the area, this Court held that the lease did not give the lessee the right to drill for coalbed methane gas.

The City argues that *Energy Development Corporation* is directly on point. Here, the EEPA between the City and Mon Power was executed in 1986 and amended in 2004. At the time the EEPA was initially signed, credits did not exist. According to the City, when the EEPA was amended in 2004, Mon Power was in possession of information regarding the possibility that there were tradeable credits associated with the energy produced by the Hannibal project. The City argues that there is a latent ambiguity in the EEPA because it does not address the credits and, therefore, pursuant to this Court's decision in *Energy Development Corpora-*

---

13. MEA also argues that Commission's decision to award the credits to the Utilities results in the taking of private property without just compensation to the owners, i.e., the Generators, in violation of the federal and state constitutions. Again, we find no merit to this argument because the Commission determined that the credits were owned by the Utilities in the first instance. The Commission's decision could not constitute an unconstitutional taking because no property owned by the Generators was taken.

*tion*, the Commission should have ruled that the credits belong to the City.

The Commission found that *Energy Development Corporation* was not applicable in this instance for two reasons. First, the Commission concluded that the 2004 amendment to the Hannibal EEPA did not amend the material terms thereof in such a manner that it constituted a new agreement. Secondly, and consequently, unlike the parties in *Energy Development Corporation* who knew of the existence of coalbed methane, the parties here were not aware of the credits because they did not exist in fact or in law at the time the EEPAs were executed. The Commission concluded that "[i]t defies logic to say that one party or the other was responsible for a latent ambiguity." Upon review, we agree with the Commission's findings because the Portfolio Act that created the credits did not exist at the time the EEPAs were executed. Therefore, neither party can be found to have created a latent ambiguity. Accordingly, there is no merit to the City's argument.

**3. Public Policy Considerations.** Finally, the Generators say that it is apparent the Commission based its decision to award the credits to the Utilities on its notions of policy and its general charge to keep utility rates down. The Generators assert that the Commission's idea of the best policy and its general rate charges is no substitute for clear legal rules already established by the Legislature and judicial opinions. The Generators assert that while the Commission may believe that the QFs will receive what they bargained for in the EEPAs, this conclusion ignores the fact that the credits have value. The Generators note that the Commission has indicated that its mission is "to ensure fair and reasonable rates and to balance the interest of the current and future utility customers, the utilities, and the state economy." The Generators assert that missing from this "balancing of interests" are the QFs who serve PURPA and the Portfolio Act's goals of expanding the nation's use of alternative energy resources.

The Commission acknowledges that its decision was based, in part, upon the legislative intent in enacting the Portfolio Act and the Commission's statutory charge to balance the interests of utilities, the public, and the state's economy in making its assessments. In this regard, the Commission explained:

> The Portfolio Act does not contain a specific provision that the utility or a PURPA generator owns the credits under the EEPAs that predate the Act. In the absence of specific statutory provisions in the Act governing the ownership of the credits under the EEPAs, the Commission must construe the [Portfolio] Act provisions, together with the provisions of Chapter 24 requiring the Commission to prescribe rates, to determine just and reasonable rates, and to balance the interest of current and future ratepayers, the utilities, and that state's economy.

The Commission further reasoned that

> [i]t would be contrary to the intent of the Portfolio Act to require the utility that has a continuing mandatory statutory obligation to purchase the qualifying generation at rates that are guaranteed pursuant to Commission Orders to separately purchase the credits from the PURPA generator, or to acquire additional credits at the expense of the utility and its customers. The credits are a measure of utility compliance with the [Portfolio] Act by purchasing qualified generation. Because it is a given that the utility has purchased and will continue to purchase qualified generation from PURPA projects, it would be wrong to require the utility to now purchase credits to "verify" those purchases for the purpose of demonstrating compliance.

In summary, the Commission concluded that the public interest favored awarding ownership of the credits to the Utilities. A decision to the contrary would result in the imposition of additional and significant expenses to ratepayers of approximately $50 to $100 million.

 As previously discussed and contrary to the assertions of the Generators, the Commission did not ignore or violate state law in reaching its decision that the credits at issue are owned by the Utilities. Likewise, the Commission did not err in considering its statutory charge to keep utility rates fair and reasonable in reaching its decision. The purpose of the Portfolio Act is to encourage the

creation and use of energy from alternative sources of energy. West Virginia Code § 24–2F–2(7) (Repl.Vol.2008 & Supp.2011) states: "It is in the public interest for the state to encourage the construction of alternative and renewable energy resources facilities that increase the capacity to provide for current and anticipated electric energy demand at a reasonable price." The credits at issue here are the means of effectuating the goals of the Portfolio Act. Because the Utilities have already agreed to purchase energy from an alternative energy facility, admittedly by a contract that is silent on the issue of credit ownership, the purpose of Portfolio Act has nonetheless been achieved. Given that the EEPAs are silent on the issue of credit ownership and there is no controlling statutory language in the Portfolio Act with regard to ownership of credits under these particular circumstances, we find that the Commission's decision is well-reasoned and supported by the evidence.[14] In summary,

we find no merit to the arguments asserted by the Generators and, therefore, the decision of the Commission finding that the credits at issue are owned by the Utilities is affirmed.[15]

## B. Certification of the Morgantown Project

MEA also assigns as error the Commission's conclusion that it has jurisdiction and authority to deem the Morgantown project certified to generate credits under the Portfolio Standard Rules upon the submission of sufficient information by the Utilities regarding the generation attributes of the Morgantown project. MEA argues that the Commission's conclusion that it can "deem" the Morgantown project certified to create credits recognized by West Virginia law contradicts MEA's federally-created exemption from "utility-type" state law regulation. As noted previously, QFs are exempted from

**14.** Like MEA, the City has also challenged the Commission's determination that its decision should be based in part upon its statutory obligation and duties in setting fair and reasonable rates for utility companies and their customers. Specifically, the City has asserted that the Commission failed to adequately balance its interests as both a producer of electricity and a public utility subject to the requirements of the Portfolio Act. We find no merit to the City's argument, however, as the evidence showed that without the Hannibal credits, the City will have more than enough credits through 2025 to comply with the Portfolio Act. By contrast, absent the credits related to the PURPA facilities, the Utilities would have a deficit by 2020 and be required to obtain over 9 million credits through 2025 at a conservative cost estimate of over $50 million.

**15.** Concurrent with the filing of this appeal, MEA also filed a petition for enforcement with FERC alleging that Commission's order violated PURPA in three ways: (1) that the order incorrectly held that the avoided cost rate paid by the Utilities to MEA is sufficient to transfer credits, together with energy and capacity; (2) that the order incorrectly held that the Commission has the authority to find MEA certified, or deem MEA certified, as a qualified energy resource able to produce credits; and (3) that the order discriminates against MEA with respect to its QF status. The City filed a motion to intervene and comments in support of MEA's petition for enforcement on March 14, 2012. On April 24, 2012, FERC ruled upon the petition for enforcement by issuing a "Notice of Intent Not to Act and Declaratory Order" in which it concluded that "certain statements in [the Commission's

order] are inconsistent with the requirements of PURPA" but also advised that it "decline[d] to initiate an enforcement action pursuant to section 210(h) of PURPA." Thereafter, by order entered on May 1, 2012, this Court ordered the parties to file supplemental briefs pursuant to Rule 10(f) of the Revised Rules of Appellate Procedure addressing the impact of the FERC order, including the extent to which additional proceedings before the Commission were necessary prior to the Court's resolution of these appeals. The Generators responded by stating that the FERC order supported their position and confirmed that this Court should vacate the Commission's order. In contrast, the Utilities and the Commission took the position that the FERC order has no impact upon this appeal. All parties agreed, however, that no additional proceedings were necessary and that this Court should proceed with resolution of the pending appeals.

Upon review, this Court finds that FERC's decision has no bearing upon this appeal. " 'An order that does no more than announce the [Federal Energy Regulatory] Commission's interpretation of the PURPA or one of the agency's implementing regulations is of no legal moment unless and until a district court adopts that interpretation when called upon to enforce the PURPA.' " *Xcel Energy Services, Inc. v. Federal Energy Regulatory Comm'n*, 407 F.3d 1242, 1244 (D.C.Cir.2005) (quoting *Niagara Mohawk Power Corp. v. FERC*, 117 F.3d 1485, 1488 (D.C.Cir. 1997)). Moreover, as explained in the analysis above, this Court has concluded that the Commission's decision is not inconsistent with PURPA but, rather, is a well-reasoned decision based upon our state law.

state laws relating to rates of electric utilities and the financial and organizational regulation of electric utilities. While the states are granted authority to approve PURPA contracts, they may not regulate QFs inconsistently with PURPA. MEA contends that requiring it to certify its facility because it is a QF constitutes impermissible "financial" and "organizational" regulation. In other words, MEA contends that the Commission cannot make management decisions for MEA in its capacity as a QF that affect its financial affairs, its rates, or its managerial discretion in the same way that the Commission can regulate a utility.

MEA further asserts that the Commission's conclusion that it can "deem" the Morgantown project as certified to create credits recognized by West Virginia law squarely contradicts its own clear and unambiguous regulation on the subject. The Commission's own regulations state that a QF must be certified as such to create credits pursuant to the Portfolio Act and the Portfolio Standard Rules. MEA says that while the Commission may believe that its refusal to request certification of the Morgantown project is "unreasonable," there is simply no authority for the Commission to deem the Morgantown project certified to create credits in West Virginia.

Upon review, we find no merit to MEA's argument. As discussed above, the Commission has determined that the credits are owned by the Utilities in the first instance. Given MEA's refusal to seek certification of its Morgantown project under the Portfolio Standard Rules, the Commission's decision to deem the project certified is the only mechanism by which the Utilities can receive certification that the energy they are purchasing satisfies the requirements of the Portfolio Act. The Portfolio Standard Rules provide for waiver thereof upon a showing of hardship or unusual difficulty in complying with any one rule. 150 C.S.R. § 34–1.5a. Certainly, a hardship on ratepayers would occur in this instance if the qualifying credits owned by the Utilities were not certified.

Contrary to the assertions of MEA, the Commission's decision that it will certify the Morgantown project to create credits under the Portfolio Act, upon the submission of sufficient information establishing that the Morgantown project satisfies the qualifications for such certification, does not constitute impermissible "utility-type" regulation prohibited by PURPA. The Commission's decision is simply an extension of its jurisdiction over public utilities and the authority conferred upon it by the Portfolio Act. By deeming the Morgantown project certified, the Commission is not regulating the Morgantown project in any respect; instead, it is only providing a mechanism for the owner of the energy, the Utilities, to receive certification that the energy they are purchasing qualifies for the purpose of satisfying the requirements of the Portfolio Act. Accordingly, the Commission's decision providing for certification of the Morgantown project under the Portfolio Standard Rules upon the submission of sufficient evidence by the Utilities is affirmed.

## IV. CONCLUSION

For the reasons set forth above, the final order of the Commission entered on November 22, 2011, is affirmed.

Affirmed.